IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BERNADETTE JOSEPH,              )
   Plaintiff,              )
       )
  vs.              )  Civil Action No. 07-260
       )
ACCESS DATA CORP., VOYAGER      )  Judge Lancaster
JET CENTER, LLC, and KARL       )  Magistrate Judge Mitchell
FOERSTER,              )
   Defendants.              )


REPORT AND RECOMMENDATION

I.  Recommendation

  It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendants Voyager Jet Center, LLC and Karl Foerster (Docket No. 44) be denied.  It is

further recommended that the motion to strike filed by Defendants (Docket No. 52) be dismissed

as moot.  It is further recommended that the motion to strike filed by Plaintiff (Docket No. 55) be

dismissed as moot.

II.  Report

  Plaintiff, Bernadette Joseph, brings this action pursuant to 42 U.S.C. §§ 2000e to

2000e-17 (Title VII) and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA).

She alleges that the Defendants, Voyager Jet, LLC ("Voyager") and its Vice President of

Operations, Karl Foerster, discriminated against her on the basis of her gender and that she was

subjected to a sexually hostile work environment to the point that she was constructively

discharged on May 10, 2006.[1]

---

[1]The complaint also named Access Data Corp., a sister company which assisted Voyager
(continued...)

Presently before this Court for disposition is a motion for summary judgment filed by Defendants and two motions to strike, one filed by Defendants and the other by Plaintiff. For the reasons that follow, the motion for summary judgment should be denied and the motions to strike should be dismissed as moot.

Facts[2]

Voyager is a private aviation firm located at the Allegheny County Airport in West Mifflin, Pennsylvania. (Compl. ¶ 3; Answer ¶ 1.) On May 11, 2005, Plaintiff was hired as Voyager's first full-time salaried "cabin service representative." (Joseph Dep. at 102.)[3] Plaintiff previously performed the cabin service representative position on a per diem basis. She worked as an independent contractor for approximately six months, from November 2004 to May 2005. (Joseph Dep. at 14; Falce Dep. Ex. 5[4]; Hargrave Aff. ¶ 4.[5]) During the course of her employment until she resigned on May 10, 2006, she was the only female flight crew member. Defendants note that Plaintiff was Voyager's only full-time salaried cabin service representative, male or

---

[1](...continued)
in the occasional provision of technical support, as a defendant. By order dated December 1, 2007 (Docket No. 42), the Court adopted a Report and Recommendation dated November 8, 2007 (Docket No. 41) and granted Access Data's motion for summary judgment on the grounds that it was not Plaintiff's employer (Docket No. 11).

[2]"We are required to review the record and draw inferences in a light most favorable to the non-moving party...." Pennsylvania Protection & Advocacy, Inc. v. Pennsylvania Dep't Public Welfare, 402 F.3d 374, 379 (3d Cir. 2005). As discussed below, Defendants have not observed this precept in their submissions, but have pointed exclusively to evidence supporting their position even when evidence to the contrary exists in the record.

[3]Defs.' App. (Docket No. 46) Ex. 1.

[4]Defs.' App. Ex. 2.

[5]Defs.' App. Ex. 5.

female.  (Joseph Dep. at 102.)

A cabin service representative is distinguished from a flight attendant in that a cabin service representative is not required to meet certain safety training requirements that are required of employees classified as flight attendants.  Plaintiff's duties included providing food and beverage service and "being really nice" to passengers.  (Joseph Dep. at 12-13.)

At the time Plaintiff started her employment, she received an employee handbook and signed an acknowledgment receipt form evidencing that she had received, read and understood it.  (Joseph Dep. at 43 & Exs. 7, 8.)  Defendants state that, as part of Plaintiff's new employee orientation/training, she received an explanation of the sexual harassment policy.  (Ryan Aff. ¶ 5;[6] Falce Aff. ¶ 5;[7] Hargrave Aff. ¶ 7; Falce Dep. at 29-32.)  Plaintiff denies that she ever read the sexual harassment policy.  (Joseph Dep. at 44.)

The policy states that "we maintain a policy prohibiting unlawful harassment, including sexual harassment....  No one has the authority to engage in this kind of unacceptable behavior and it will not be tolerated."  (Joseph Dep. at 43 & Ex. 8 at 3-4; Ryan Aff. ¶ 5; Falce Aff. ¶ 5; Hargrave Aff. ¶ 7; Falce Dep. at 29-32.)  The policy further states that:

> If you have witnessed harassment of others or it you believe you have been harassed in violation of this Policy, you should promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to your immediate supervisor, or to a higher Company official, or to the Human Resources department.  The Company will not retaliate or take any adverse action against an employee for truthfully reporting conduct that the employee in good faith believes to be in violation of this Policy or for participating in good faith in an investigation of sexual harassment or in any other proceeding or hearing relating to alleged harassment.  Supervisors should immediately report any

---

[6]Defs.' App. Ex. 3.

[7]Defs.' App. Ex. 4.

3

incidents of harassment to the Human Resources department. Your Human Resources department will investigate all such claims and take appropriate corrective action. However, if the complaint of harassment relates to an employee in the Human Resources department, the complaint will be investigated and resolved by a neutral management official outside that department. All harassment complaints will be treated with the strictest confidence possible.

(Joseph Dep. Ex. 8 at 4.)

The policy provides the following complaint procedure:

All employees are responsible for creating and maintaining an atmosphere free of discrimination and harassment, sexual or otherwise. Further, employees are responsible for protecting the rights of their co-workers.

If you experience harassment at work based on your race, color, religion, sex, national origin, age, disability, or another factor protected by federal, state or local law, or you believe that you have been treated in an unlawful, discriminatory manner, promptly report the incident to your supervisor, any member of management or the Human Resources department. The Human Resources department, in cooperation with the appropriate manager(s), will investigate the matter and take any necessary action. You should also report any harassment or perceived discriminatory treatment that you observe being directed at others in the workplace. Your complaint will be kept confidential to the maximum extent possible.

If the Company determines that an employee is guilty of harassing another individual, appropriate disciplinary action will be taken against the offending employee, up to and including termination of employment.

This Company prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation in good faith.

(Id.)

The parties dispute who was Plaintiff's immediate supervisor. Plaintiff states that it was

Defendant Karl Foerster, Vice President of Operations. (Joseph Dep. at 177; Foerster Dep. at 6,

17, 39;[8] Heiles Dep. at 8.[9])  Defendants proffer the affidavit of Chief Pilot Robert J. Hargrave,

who states that he is and was, at all relevant times, the immediate and direct supervisor for all

flight crew employees, including pilots, flight attendants, and cabin service representatives, such

as Plaintiff.  (Hargrave Aff. ¶¶ 1, 5.)  According to Voyager, Hargrave was Plaintiff's supervisor

and Foerster was Hargrave's supervisor.  (Falce Dep. at 19.)  However, Foerster himself stated at

his deposition that someone had "called me specifically, knowing that I was her direct

supervisor..." (Foerster Dep. at 39.)  As all disputed issues must be construed in favor of

Plaintiff as the non-moving party, the Court will accept that Foerster was her direct supervisor.[10]

Foerster's position as Vice President of Operations gave him responsibility for all flight

operations as well as some limited duty as a flight pilot.  (Falce Dep. at 55, 56; Foerster Dep. at

16, 17.)  Defendants note that Foerster's piloting duties were extremely limited: he actually

piloted Voyager aircraft less than one hundred hours per year (Foerster Dep. at 15), and by

Plaintiff's own admission, she "very rarely" flew with him – on only six occasions in 2005 and

just twice in 2006.  (Joseph Dep. at 82.)

Plaintiff alleges that Foerster subjected her to a course of sexually harassing conduct

during her employment with Voyager.  Specifically, she alleges the following:

1) On a flight layover in Florida in January of 2006, Foerster kissed her at a restaurant

---

[8]Pl.'s App. (Docket No. 48) Ex. 3.

[9]Pl.'s App. Ex. 5.

[10]In any event, this dispute is not material to the issues in this case:  "An employer is
subject to vicarious liability to a victimized employee for an actionable hostile environment
created by a supervisor with immediate (or successively higher) authority over the employee."
Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).

while drunk, and expressed his desire to come to her hotel room later. Foerster did, in fact, seek admittance to her hotel room later that evening, but she refused to admit him. (Joseph Dep. at 82, 123-25, 186-87 & Ex. 29.) She told Arthur Heiles, another pilot who was on the trip with them, about it. (Heiles Dep. at 13-14.) Defendants deny that this incident occurred.

2) On another occasion, when she and Foerster were attending Catholic mass together on a layover, Foerster kissed her rather than offering the traditional handshake as the sign of peace. (Joseph Dep. at 82, 123-25, 186-87 & Ex. 29.) Oddly, Defendants contend both that Foerster did not kiss her and that such a gesture is a traditional custom during the offering of peace at Catholic mass (citing the Bible).

3) Plaintiff states that Foerster denied her request for a corporate credit card until her last trip with Voyager, the details of which are discussed below. (Joseph Dep. at 82, 108.) She contends that all male flight crew members were issued Voyager corporate credit cards immediately upon hire. (Heiles Dep. at 9.) Defendants respond that, pursuant to Voyager's corporate credit card policy, eligibility for receipt of a corporate credit card was determined by the Chief Financial Officer and was based upon the employee's position and whether there was a need for a card. (Falce Dep. at 10 & Ex. 5.) Until Plaintiff's request, only pilots received corporate cards, due to the fact that pilots not only had to pay for hotel rooms and meals, but also aircraft fuel and ground transportation for customers, which frequently cost thousands of dollars. (Foerster Dep. at 23.) Plaintiff acknowledged that she was the first cabin service representative to request a corporate credit card and that the company was undergoing "growing pains." (Joseph Dep. at 102-03.)

Defendants contend that Plaintiff acknowledged at her deposition that she understood that

all of her personal expenses during business trips would be covered by the pilots.  Her actual testimony, when asked if Foerster had told her that the pilots would handle her expenses, was as follows:

> Yes.  This was all new.  I was the first salaried flight attendant they had.  I was in unchartered territory.  So there were times that I had to fly to point B without pilots, perhaps meeting the pilots, and if I got stuck and I didn't have a corporate credit card, I would have been required to use my own.

> So it would have just been a convenience based on the fact that my husband's credit sucks so bad, I couldn't get a credit card....  So it would have been nice, and at some point, Karl did agree.  And it took time.  We were busy, we were growing.  There were a lot of growing pains, and I was one of them.

(Joseph Dep. at 102-03.)

Plaintiff states that, although Voyager's credit card policy provided that eligibility to receive the card would be determined by the chief financial officer of Voyager's parent, Foerster represented to Plaintiff that he would obtain a credit card for her when she invited him to her new home as a newly divorced woman.  (Joseph Dep. at 186-87 & Ex. 29; Falce Dep. at 7-11 & Ex. 2.)  Defendants deny that Foerster made this representation.

4) Foerster made constant remarks to Plaintiff that he had a stack of resumes of women who were "dying to replace" her, making it clear to her that she "walked a tightrope." (Joseph Dep. at 187 & Ex. 29.)  She stated that it was "commonly known that [Foerster] had intentions," and that it was "well known among the pilot group" that Plaintiff had been going through "mental torture" with Foerster making "remarks and advances" and her "job hanging by a thread."  (Joseph Dep. at 186-88; Heiles Dep. at 13-14, 19-20 & Ex. 2.)  Plaintiff found Foerster's behavior "revolting." (Joseph Dep. at 187.)  Defendants deny that Foerster made such comments to Plaintiff and also argue that there is no sexually harassing or discriminatory

connotation to the statements.[11]

5) Approximately one month prior to her resignation, Plaintiff was coming due for a performance review, which was tied to her anniversary date of May 11, 2005. (Falce Dep. at 47.) She states that, at that time, Foerster told her that her review, raise, and corporate credit card would come only when he received an invitation to her new home. She testified that "[a]nytime anything like that was said, I told somebody, whether it was Art [Heiles], Rob [Hargrave] or Bob Verner." (Joseph Dep. at 123 & Ex. 29.) Defendants deny that Foerster said this.

6) From May 4 to May 8, 2006, Plaintiff flew on a five-day trip with Foerster and Hargrave. (Joseph Dep. at 82, 108; Hargrave Aff. ¶ 8.)[12] She states that, prior to departure, Foerster told her that he "couldn't wait to get [her] to Mexico" and that Hargrave then told her that he would not let Foerster get anywhere near her during the trip. (Joseph Dep. at 111.) Defendants deny that Foerster said that he could not wait to get her to Mexico and they have submitted an affidavit in which Hargrave denies making the statement that he would not let Foerster anywhere near her during the trip. (Hargrave Aff. ¶ 9.)

---

[11]Defendants also argue that this allegation is contrary to Plaintiff's "admission" that she was never threatened with termination during her employment with Voyager. (Joseph Dep. at 171.) If Plaintiff contradicted herself at her deposition, then the issue is to be decided by the jury–for purposes of the pending motion, the Court will assume that Plaintiff's testimony consists solely of the statement cited in the text. Moreover, this argument takes the reference out of context: Plaintiff was asked by her counsel whether she was ever told by anyone at Voyager that she was about to be fired (in order to address the question of whether she had provided the true reason she resigned on applications she submitted to other employers), not whether Foerster had intimated that she could easily be replaced if she did not succumb to his demands.

[12]Defendants note that Plaintiff was a passenger on the last leg of this trip and that she could have taken a commercial airline back to Pittsburgh. (Joseph Dep. at 85-86.) However, it was not Plaintiff's obligation to make every effort to avoid being on a plane with Foerster. Rather, the law imposes on Voyager a duty to maintain a workplace in which supervisors do not sexually harass employees.

6) On that same trip, while on a layover in Palm Springs, Plaintiff was having dinner with Hargrave and Foerster. She alleges that Foerster showed her a corporate credit card that had been issued in her name. She returned it to him so that it could be activated and he then stuck it in the front of his pants, telling her it came "with restrictions." Plaintiff interpreted the "with restrictions" comment to mean she would have to sleep with him to get it. She states that Hargrave had already left the table when this occurred. After the credit card incident, Plaintiff refused to have dinner with Foerster and Hargrave again. (Joseph Dep. at 108-09, 186-87.)

Defendants deny that this incident occurred. Hargrave states that:

> During our stay in Palm Springs, I attended dinner with Mr. Foerster and Plaintiff Joseph. At this dinner, Mr. Foerster removed a corporate credit card from his shirt pocket and presented [it to] Plaintiff Joseph. Mr. Foerster later requested that Plaintiff Joseph return the credit card so that it could be activated. Plaintiff Joseph returned the card to Mr. Foerster, who then placed it back into his shirt pocket.
>
> Mr. Foerster did not place the credit card in his pants, nor did Plaintiff Joseph report any such conduct to me, either during or after the trip.
>
> I did not hear Mr. Foerster state the credit card "came with restrictions," nor did Plaintiff Joseph report any such statement to me, either during or after the trip.
>
> I was present with Mr. Foerster and Plaintiff Joseph at all times during their discussions regarding the credit card.
>
> Following dinner, Mr. Foerster transferred possession of the credit card to me.

(Hargrave Aff. ¶¶ 10-14.) Plaintiff notes that Hargrave was not asked why the card was not activated and returned to her. (Falce Dep. at 39, 40.) Defendants contend that the card was not returned to her because she quit her employment two days later.

7) Plaintiff states that she was never given a credit card receipt form to sign as required

by Voyager policy, and that the credit card was never returned to her. (Falce Dep. at 7-16, 18-21.) She notes that, during a subsequent investigation, it was never determined why, if the credit card incident occurred as described by Foerster, the card was never returned to her, which was supposed to be the point of having it sent by Fed-Ex to Foerster in the first place. (Falce Dep. at 74-75.) Defendants contend that this is because she resigned two days later.

She also states that, at the time of her resignation, the card had already been cancelled, citing the deposition of Charles Falce. Falce's actual testimony was that a termination checklist indicated that any credit card Plaintiff possessed should be cancelled because she had resigned. (Falce Dep. at 16.) Defendants have also submitted a declaration by Falce, in which he states that the card was not cancelled until October 20, 2007. (Falce Decl. ¶¶ 2-4 & Ex. A.)[13]

8) Finally, during this trip, when Foerster passed Plaintiff in the galley of the aircraft, he shut the door and grabbed her "up and down and in and out," then returned to the cockpit without being seen. (Joseph Dep. at 125.) Defendants deny that this occurred. They also contend that Plaintiff admitted that the galley of the aircraft was narrow and that Foerster had to touch her in some fashion in order to pass by. However, her actual testimony was that "yes, he would, but not the way that he did. His hands would not have to do what they did while he passed me, like this (demonstrating)." (Joseph Dep. at 126.)

Plaintiff states that she reported that grabbing to Hargrave, who did nothing. (Joseph Dep. at 125.) Hargrave denies it. (Hargrave Aff. ¶¶ 15-17.) Richard Ryan, Voyager's president and Foerster's immediate superior, states that he was on the flight, that he and Plaintiff were seated in the passenger section, that Foerster was the co-pilot and was seated in the cockpit and

---

[13]Defs.' Reply Pl.'s Counterstatement Facts (Docket No. 50) Ex. A.

that at no time during the flight from Allentown to Pittsburgh did she report any inappropriate conduct or statements by Foerster to him, although she had more than adequate opportunity to do so. (Ryan Aff. ¶¶ 1, 10-12.) Plaintiff acknowledges that Ryan was aboard the aircraft on the final leg of the May 4-8 trip, but she states that two other men with whom she was not familiar were also in the cabin, so that she had no opportunity to speak with Ryan privately. (Joseph Dep. at 86-87.) Construing all disputed issues in Plaintiff's favor, the Court will assume that she had no opportunity to speak with Ryan privately on this flight.

The Events of May 10, 2006

At 8:00 a.m. on May 10, 2006, Plaintiff called Voyager President Richard Ryan at home to report Foerster's manipulation of the credit card issuance, refusal to grant her a performance review or raise, and inappropriate physical contact with her on the plane. Ryan requested a meeting and they arranged to meet the following day. (Joseph Dep. at 132-33; Ryan Aff. ¶ 6.)

An hour and a half later (that is, at 9:30 a.m. on May 10), Plaintiff wrote an email message to Ryan, in which she explained that she could not meet with him the next day as they had discussed because she would be flying out that day. The message contained further details about her accusations against Foerster, as follows:

> Karl is making things very difficult for me at work. Everything from keeping my Corporate American Express Card, (he waved it around over dinner in Palm Springs and I never saw it again) to our conversations (he said the card, as well as a possible review and raise would come only when he received an invitation to my new home ... as I mentioned to you, I'm going through a divorce). His remarks about being able to replace me with someone at half my pay rate are constant. On one overnight, he asked (and I declined) if he could come to my room later in the evening after kissing me he sloppily kissed my cheek. Rich, please understand, I have no problem "hanging with the boys" ... talking trash and having fun ... I have a wonderful sense of humor, but none of your pilots have ever made me uncomfortable or been inappropriate ... ever, except Karl. Karl is using his position to corner me in any way he can because I have clearly rejected his

advances.  When passing me in the galley of the G3, he holds my waist and gropes me as he passes by to get back into the cockpit.  Rich, I don't take up that much room for that type of touching to be necessary.  He's finding fault with everything [from] my catering orders ... to verbally berating me in public when I asked how I could better assist Christine and Audrey when they asked how to help get the Challenger ready for charter flights (Karl had originally ask[ed] that I help them.)  Both Art Heiles and Bob Verner suggested that I speak with you, but I didn't want to cause a problem or worse, get fired, but the situation has become intolerable.  I adore the Dolan family, I love my job and I give my very best.  I am also a single mother that needs her job.  Your assistance in this matter is greatly appreciated.  I don't know what to do....  It is with great regret that I write this and hope that you can help me.

(Joseph Dep. at 121-22, 133 & Ex. 29; Ryan Aff. ¶ 7.)

Plaintiff states that, shortly thereafter,[14] Ryan called her back and told her that he knew she was a troublemaker and that he had not believed her previous report of pilot misconduct, that he accused her of dressing inappropriately on her last flight, that he said she would not be fired unless she was "proven wrong," and that he told her that she was ruining the life and career of an individual liked by the company's owner (namely Foerster).  (Joseph Dep. at 138-41 & Ex. 36.)  Plaintiff states that, based on Ryan's reaction to her complaints about Foerster, she became convinced that his help was not forthcoming, and that she had no choice but to resign.  (Joseph Dep. at 138-40 & Ex. 36.)  Therefore, at 3:17 p.m. that day, she sent an email to Ryan in which she resigned from her employment with Voyager:

This letter serves as my letter of resignation effective immediately.  It was a pleasure being of service to Voyager Jet Center.  My best wishes for the company's future success.

(Joseph Dep. at 137-38 & Ex. 9.)

---

[14]In Voyager's response to Plaintiff's EEOC charge (a document that has been submitted by both sides in this case), the company indicated that Plaintiff told Falce that Ryan called her back around 11:00 a.m.  (Falce Dep. Ex. 5 at 5.)

Defendants deny that Ryan called her a troublemaker, stated he did not believe a prior report of pilot misconduct she made or told her that she was threatening anyone's life or career. (Ryan Aff. ¶ 6.) Ryan denies having any further communications with Plaintiff until 3:17 p.m. on May 10, when she sent him the second email in which she voluntarily resigned her employment with Voyager without explanation. (Ryan Aff. ¶ 8.)

Later in the day on May 10, pilot Arthur Heiles learned of Plaintiff's resignation and he wrote an email to her in which he stated, "No doubt the [sic] you have been subjected to mental games that should have never permitted to progress." (Heiles Dep. Ex. 2.) Plaintiff wrote back to Heiles, stating as follows:

> Art ... Rich lost my confidence when he 1) told me I was dressed inappropriately on an off-duty day when I called specifically for help with Karl on a very serious issue, 2) he told me that although I wouldn't get fired unless I was proven wrong, his arrogant tone was clear as were [his] comments that I would be ruining the career and life of someone that the Dolan's liked (Karl) and 3) Rich didn't believe me over the Jim Dellaria incident after NEVER having discussed it with me!!! ... So, I can't trust Karl, Rob is a joke and Rich was useless ... why should I think it would get any better traveling higher on the food chain in the hopes of finding fairness?

(Joseph Dep. Ex. 36.)

<u>The Investigation</u>

On the morning of May 11, 2006, Ryan contacted Charles Falce, Senior Vice President of Human Resources for Voyager Group, which owns Voyager, and instructed him to contact Plaintiff to schedule a time to meet with her and commence an investigation into her allegations. (Falce Aff. ¶¶ 1, 6; Ryan Aff. ¶ 9; Falce Dep. Ex. 5.) Falce left voicemail messages on Plaintiff's cell phone and home telephone, but she did not respond. (Joseph Dep. at 144; Falce Aff. ¶ 7.) Later that same afternoon, Falce sent Plaintiff an email to which she responded, indicating that

she would call him the next day, May 12, 2006. (Joseph Dep. at 145 & Ex. 31; Falce Aff. ¶ 8.)

By reply email, Falce requested that she meet with him in person on May 12 to investigate the

allegations in her May 10 call and email to Ryan. Plaintiff contacted Falce by telephone at 3:00

p.m. on May 12 and they agreed to meet at 11:00 a.m. on Monday, May 15, 2006. (Falce Aff.

¶ 9.)

On May 15, Plaintiff met with Falce, who undertook the investigation into her

complaints. (Joseph Dep. at 145-46; Falce Dep. at 5-7, 34; Falce Aff. ¶ 10.) She states that she

related to Falce all the information that she had related to Ryan, and that she also told Falce that

Ryan himself had previously made inappropriate comments to her, remarking on one occasion

that he thought she would look great naked under a fur coat and on another that she could get her

car washed if she was better to the boss. (Joseph Dep. at 138-41, 146-47.) Falce denies that she

made any allegations against Ryan. (Falce Aff. ¶ 11.)[15] The meeting ended with Falce telling her

that he would investigate her complaints and Plaintiff states that she believed him. (Joseph Dep.

at 148; Falce Aff. ¶ 12.)

Falce then commenced an investigation, during which he interviewed Foerster, Ryan,

Hargrave and pilots Arthur Heiles and Bob Verner. (Falce Aff. ¶ 12.) According to Falce,

Foerster adamantly denied all the allegations Plaintiff made. (Falce Dep. at 35-36 & Ex. 5 at

5.)[16] Falce further states that none of the people Plaintiff identified "corroborated any of [her]

allegations. Additionally, no one has ever made any similar complaints about Mr. Foerster or

---

[15]Defendants note that Plaintiff's complaint in this case does not contain any allegation of
improper conduct by Ryan.

[16]Although Foerster's deposition was taken in this case, neither side asked him whether
he engaged in the behavior Plaintiff accuses him of.

purported to have witnesse[d] such conduct." (Falce Aff. ¶ 12.)[17] Falce further states that:

> After completing the investigation, I reported the results to Plaintiff Joseph, sent Mr. Foerster for refresher training on Voyager's Non-Harassment policy, informed Plaintiff Joseph of this fact, and asked her to rescind her resignation and return to Voyager's employ. Plaintiff Joseph rejected this offer.

(Falce Aff. ¶ 13.)

However, this is not an accurate description of the events that transpired. Falce's letter to Plaintiff, dated May 23, 2006, actually stated that:

> As a follow-up to our meeting on Monday, May 15, 2006, I conducted a thorough investigation into the allegations that were brought to my attention. Through both personal and telephone interviews that were conducted, there is no evidence to support your claim of any wrong doing or harassment on the part of Mr. [Foerster]. All employees interviewed have been reminded of the company's zero tolerance policy as it relates to harassment and the confidentiality of this investigation. As a result of this investigation, it is determined that no corrective actions are warranted at this time.

> We would like to discuss the possibility of your returning to your position. If you are interested, please contact me directly...

(Joseph Dep. Ex. 32.) Thus, the letter did not notify Plaintiff that Foerster was being sent for refresher training and did not ask her to rescind her resignation but only indicates that Voyager wished to "discuss the possibility." Moreover, Falce acknowledged at his deposition that Foerster was not sent to refresher training until "several months afterwards." (Falce Dep. at

---

[17]Falce's statement that Plaintiff identified Hargrave, Heiles and Verner as **witnesses** to her various claims is at odds with Voyager's response to Plaintiff's EEOC charge, in which Voyager indicated that Plaintiff named Hargrave as a witness to the credit card incident and "also stated that Messrs. Verner and Heiles were aware of how she had been treated by Mr. Foerster." (Falce Dep. Ex. 5 at 4.) More importantly, as discussed below, an employee who alleges sexual harassment is not required to "corroborate" her claims with eyewitness testimony.

41.)[18]

Plaintiff contends that, during Falce's investigation, Heiles confirmed that she had complained to him about inappropriate conduct by Foerster. As noted above, Heiles stated that she told him about the incident in which Foerster kissed her and tried to gain access to her hotel room. (Heiles Dep. at 13-14.) At his deposition, Falce testified as follows:

> A. With Mr. Heiles, his answers to me were anything he would know was purely hearsay, he had only heard it from Bernadette, had never seen, witnessed, heard anything that, you know, could validate any of her complaints that she made about Mr. Foerster.
>
> Q. Did he indicate anything to you about what she had told him?
>
> A. Yes.
>
> Q. And what was that?
>
> A. It was various things. You know, that Mr. Foerster made her feel uncomfortable. Made comments to her.
>
> Q. Did he indicate to you what kind of comments?
>
> A. Only that, you know, comments that Bernadette had shared with me, you know. But again, ... Mr. Heiles said that it was all hearsay, just things that he heard from Ms. Joseph.

(Falce Dep. at 37-38.)

Plaintiff also contends that Verner confirmed that she had complained to him. However, she points to no record support for this contention: Falce stated that Verner merely said "it's sad that she's leaving, she was a good flight attendant. But he had never flown with Mr. Foerster and

---

[18]In Voyager's response to Plaintiff's EEOC charge, which was dated July 19, 2006, the company stated that "there was no evidence to support Ms. Joseph's claims and as a result no corrective actions were warranted." (Falce Dep. Ex. 5 at 6.) No reference was made to Foerster being sent to refresher training.

Ms. Joseph, so he had, you know, no firsthand knowledge of anything." (Falce Dep. at 38.) Defendants have submitted a declaration by Verner, in which he states that he did not personally witness any inappropriate conduct directed to Plaintiff from any employee of Voyager, including Foerster. (Verner Decl. ¶ 4.)[19] As for, Hargrave, Defendants have submitted an affidavit in which he states that he was unaware of her allegations until after she resigned her employment on May 10, 2006 and that she never reported to him that Foerster had said she would be given a review or a raise only after he received an invitation to her new home. (Hargrave Aff. ¶¶ 3, 18, 19.)

Plaintiff contends that, although under Voyager's policy, a performance review should have been prepared, Falce made no inquiry as to why it wasn't. Defendants respond that Falce testified that she was not due for a performance review until after May 11, 2006, her anniversary date with Voyager, and that by that time she had resigned. (Falce Dep. at 47.)

Plaintiff declined to return to her position. On May 28, 2006, she wrote the following letter to Falce:

> I have reviewed your letter of May 23, 2006 with my attorney. As I have already informed you, I am not willing to return to work with Voyager Jet unless and until the circumstances that caused me to leave have been addressed. Your letter clearly reflects that Voyager intends to protect the individual who harassed me. This tells me that there is no "zero-tolerance" for harassment at Voyager Jet. Quite the opposite, the reaction I got when I made my complaint and the conclusion in your letter that there is no evidence to support my claim sends a very clear message that the policy at Voyager Jet is to protect one of the good ol' boys and cast me out for complaining.
>
> I should not have to place myself back in a position where the person can resume harassing me with the full protection of the Company, and I refuse to do

---

[19]Defs.' App. Ex. 7. However, it is noted that Verner does not address the question of whether Plaintiff reported anything to him.

so.

I am truly disappointed with the response I have received. I loved my job and I left USAirways after 23 years to join Voyager Jet believing I had found a new career in private aviation. Now I find that the Company cares more about protecting its manager than doing what is right. You have left me no alternative but to pursue my legal remedies.

(Joseph Dep. Ex. 33.)

Procedural History

Plaintiff filed this action on February 28, 2007. Count I alleges that Foerster created a sexually hostile work environment and that she made management aware of it, but nothing was done. Thus, she alleges that Voyager is liable for sex discrimination, a sexually hostile work environment and constructive discharge, in violation of Title VII. Count II alleges that these same facts violated her rights under the PHRA. Count III is a state law claim for assault and battery against Foerster.

On January 31, 2008, Defendants filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Defendants contend that: 1) Plaintiff cannot establish the elements of a sexually hostile work environment and Voyager is entitled to an affirmative defense based on her failure to avail herself of its anti-harassment policy; 2) Plaintiff cannot maintain a constructive discharge claim because she cannot demonstrate that a reasonable person subjected to the alleged discrimination would have been compelled to resign, and she cannot establish the predicate existence of a legally cognizable hostile work environment; 3) Voyager is entitled to partial summary judgment on the issue of damages–Plaintiff is not entitled to any back or front pay damages in light of her unreasonable refusal to return to work; and 4) Foerster is entitled to summary judgment with respect to her state law claims of assault and battery.

Counts I-II: Hostile Work Environment/Constructive Discharge Claims

Title VII provides that:

It shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e-2(a). The PHRA provides, inter alia, that it is an unlawful employment practice:

> For any employer because of the ... sex ... of any individual ... to discriminate against such individual ... with respect to ... conditions or privileges of employment or contract, if the individual ... is the best able and most competent to perform the services required.

43 P.S. § 955(a).  Claims brought under the PHRA are analyzed under the same standards as claims under Title VII.  Weston v. Commonwealth of Pa., 251 F.3d 420, 425 & n.3 (3d Cir. 2001).

The United States Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).  The Court of Appeals has held that a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted).  Defendants argue that Plaintiff cannot establish that the discrimination was severe or pervasive or that she was detrimentally affected by it.  Plaintiff responds that she has met both of these elements of her hostile work environment case.

Was the Conduct Severe or Pervasive?

Defendants argue that the conduct to which Plaintiff points was not pervasive or severe. They note that a court must look to many factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance."  Weston, 251 F.3d at 426 (citations omitted).  Defendants admit that the line between an unpleasant

working environment (which is not actionable) and a hostile one (which is actionable) is not a bright one.  However, they contend that there is simply insufficient gravity to the conduct about which Plaintiff complains, which they describe as Foerster: 1) denying her a corporate credit card until May of 2006, stating that the card "came with restrictions" and placing it in his pants; 2) holding her waist as he passed her in the narrow galley of an aircraft during the May 4-8, 2006 trip; 3) kissing her on the cheek at mass during a January 2006 trip; and 4) requesting an invitation to her home and admittance to her hotel room on two isolated occasions.

The Supreme Court has stated that: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The Court of Appeals has held that "courts should not consider each incident of harassment in isolation.  Rather, a court must evaluate the sum total of abuse over time." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) (citing Andrews, 895 F.2d at 1484).  In that case, the evidence demonstrated that Dianne Evans, who had been an extremely successful life insurance salesperson for Met Life for seventeen years, had been recruited to join Durham, where she was promised her own office and secretary, as well as unlimited phone and mailing costs to be paid for by Durham.  However, when new managers took over, they fired Evans' secretary, took over her office and (at least on one occasion) grabbed her buttocks from behind and told her that she smelled good.  She was assigned numerous "lapsed books," policies that were no longer active because the policyholders had switched insurance companies, and

because of the way commissions were calculated, her bonus was severely cut; no male agents received as many lapsed books. In addition, Evans was subjected to derogatory comments, including the following: she "made too much money for a goddamn woman"; she was asked to go dancing "into the fields" with the acting general manager; she was threatened that if she tried to leave and take clients with her the company would "attach her house before she left the courtroom"; when she lost an account because promised legal assistance from the home office did not arrive, her supervisor said "What do you know about annuities, you're only a woman." Finally, she was told that she was being moved to another office and then (after she had assembled all of her files for the move) she was told that she was not moving and she discovered that her files were gone. Id. at 145-46.

Durham argued that the court should not have considered all of these incidents together, because some of them were apparently triggered by sexual desire, some were sexually hostile some were non-sexual but gender-based, and some were facially neutral. However, the Court of Appeals held that it would "treat the sexual misconduct and the gender-based mistreatment in this case as sex discrimination. The facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constituted the hostile work environment." Id. at 148 (citations omitted). See also Abramson v. William Paterson College of N.J., 260 F.3d 265, 276 (3d Cir. 2001) ("While the individual pieces of evidence alone may not suffice to make out the claims asserted, we must view the record as a whole picture.")

Defendants have not adequately represented the number or severity of incidents Plaintiff describes. For example, she does not allege that Foerster merely "grabbed her waist" on the plane, but that he grabbed her "up and down and in and out" and that he did far more than was

necessary to merely pass her in the narrow galley.  The type of physical contact she alleges falls

at the more serious end of the continuum that ranges from casual contact that might be expected

among friends (a hand on the shoulder, a brief hug, a peck on the cheek) to full-scale sexual

assault.  See Patton v. Keystone RV Co., 455 F.3d 812, 816-17 (7th Cir. 2006) (supervisor

putting his hand along plaintiff's inner thigh, under her shorts and touching her underwear before

she could break away, even in isolation, was probably sufficient to demonstrate a hostile work

environment and certainly met the standard when considered along with his other conduct).

In addition, Plaintiff alleges that this occurred more than once.  Defendants argue that the

complaint and her deposition testimony identify only one incident, but that conclusion requires

drawing inferences against Plaintiff, which is improper.  The complaint alleges that, on the last

flight during May 2006, Foerster "touched [her] inappropriately when he encountered her in the

galley of the aircraft" (Compl. ¶¶ 17, 19), which is ambiguous in that it could mean only once or

multiple instances.  Her deposition testimony states that she said nothing to Foerster when he

grabbed her because she was "stunned," which implies one occurrence.  (Joseph Dep. at 125-26.)

On the other hand, in her email message to Voyager president Richard Ryan on May 10, Plaintiff

wrote that "[w]hen passing me in the galley of the G3, he holds my waist and gropes me as he

passes by to get back into the cockpit."  (Joseph Dep. Ex. 29.)  The use of the present tense

implies that Foerster did so more than once.  Ryan indicated that he received the May 10 email

with its description that could indicate more than one groping incident.  (Ryan Aff. ¶ 7.)  Falce

states that, when he met with Plaintiff, she reiterated and repeated the allegations discussed in the

May 10 email.  (Falce Aff. ¶¶ 11-12.)  Finally, in Voyager's response to Plaintiff's EEOC charge,

the company indicated that she told Falce "that on **flights** with Mr. Foerster, he **had groped her**

when passing her in the galley of the plane." (Falce Dep. Ex. 5 at 4) (emphasis added). This description strongly suggests that she reported more than one incident. As noted above, because all inferences must be drawn in Plaintiff's favor, she is alleging that Foerster grabbed her more than once on that final flight.

In another example, Defendants suggest that Foerster allegedly kissed Plaintiff on only one occasion, but she contends that he did so on two occasions: once at a restaurant (after which he tried to gain access to her hotel room) and another time when they attended mass together. (Joseph Dep. at 82, 123-25, 186-87 & Ex. 29.) In addition, although Defendants contend that Foerster's kissing of Plaintiff at mass was the "offering of peace" that is commonly practiced, Plaintiff argues that it was not. The trier of fact must determine how to interpret this incident. They also downplay certain events by contending that she is alleging that he denied her a corporate credit card until May of 2006 and that he requested admittance to her home on one occasion, but her actual allegations are that he tied these events together, telling her that she would not receive a review, raise or credit card until she invited him to her home. Finally, Defendants have omitted Plaintiff's allegation that Foerster told her he had a stack of resumes from women who were dying to replace her, so that she believed that she would have to accede to Foerster's sexual demands in order to keep her job.

Considering the evidence as a whole, as presented by Plaintiff and in the light most favorable to her as the non-moving party, she has alleged that Foerster kissed her on two occasions, tried unsuccessfully to gain access to her hotel room, told her constantly that he had a stack of resumes from women who were dying to replace her, told her that she would not receive her credit card, review and raise until she invited him to her new home as a recently divorced

woman, finally showed her the credit card and then put it in his pants while saying it "came with restrictions" and groped her on more than one occasion on the May 2006 flight using the pretext of having to pass her in the narrow galley of the plane. These incidents are sufficient to be submitted to the trier of fact to determine whether they are severe or pervasive enough to create a hostile work environment.

### Was Plaintiff Detrimentally Affected by the Conduct?

Defendants argue that Plaintiff initiated and willingly participated in sexual banter and activity at work and outside of work and therefore, despite her claim, she cannot establish that Foerster's alleged conduct detrimentally affected her. Plaintiff responds that, although she may have joked around with her colleagues, she never did so with superiors (such as Foerster) and that she never suggested to him in any fashion that his behavior was welcome.

The Supreme Court has held that the relevant inquiry is whether the victim "by her conduct, indicate[d] that the alleged sexual advances were unwelcome." Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986). The Court of Appeals has noted that the "inherently subjective question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns primarily on credibility determinations which are inappropriate for summary judgment." Clegg v. Falcon Plastics, Inc., 174 Fed. Appx. 18, 25 n.7 (3d Cir. 2006) (citation omitted). See also Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1108 (8th Cir. 1998) (whether conduct is unwelcome is a fact question for the jury and will largely turn on credibility determinations). Defendants point to no evidence in the record that would support the contention that Plaintiff welcomed Foerster's alleged advances and she has presented evidence that she did not.

Defendants also attempt to ascribe an innocent connotation to Foerster's alleged comment (which both Foerster and Hargrave deny he made) that the credit card "came with restrictions" by referring to the fact that he had criticized her for having spent large amounts of money on certain catering orders. (Joseph Dep. at 110; Foerster Dep. at 26-27.) The trier of fact might believe this explanation; it might also believe Plaintiff's explanation that, in context, the comment was a suggestion that Plaintiff would have to sleep with Foerster to obtain the credit card. The Court cannot resolve this issue on a motion for summary judgment.

Defendants cite evidence that Plaintiff was not "Victorian" in her personality, that she engaged in playful banter of a sexual nature in the workplace and that she engaged in certain other activities outside the workplace[20] to support the argument that she was not offended by the conduct she alleges by Foerster. Plaintiff objects to the admissibility of all of this evidence, citing Rule of Evidence 412.

Federal Rule of Evidence 412 provides that:

> The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):
>
> (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
>
> (2) Evidence offered to prove any alleged victim's sexual predisposition.

Fed. R. Evid. 412(a). Subdivision (b)(2) indicates that:

> In a civil case, evidence offered to prove the sexual behavior or sexual

---

[20]Specifically, they note that she wrote an article that contained sexual references such as the "mile high club" and the "horizontal tango"–which she explained was a fiction piece–and that she worked briefly as a "golden dollar girl" at a strip club–which she explained was for the purpose of writing an exposé about it. (Joseph Dep. at 29, 159-62 & Exs. 47, 49.)

predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party.  Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.

Fed. R. Evid. 412(b)(2).  The rule contains a procedure to determine admissibility in which the party seeking to offer evidence must submit a written motion under seal at least 14 days before trial specifically describing the evidence and purpose for which it is offered and the court must hold an in camera hearing to determine if the standard is met.  Fed. R. Evid. 412(c).  The Advisory Committee note explains that the rule was amended in 1994 to:

> exclude all other evidence relating to an alleged victim of sexual misconduct that is offered to prove a sexual predisposition.  This amendment is designed to exclude evidence that does not directly refer to sexual activities or thoughts but that the proponent believes may have a sexual connotation for the factfinder.  Admission of such evidence would contravene Rule 412's objectives of shielding the alleged victim from potential embarrassment and safeguarding the victim against stereotypical thinking.  Consequently, unless the (b)(2) exception is satisfied, evidence such as that relating to the alleged victim's mode of dress, speech, or life-style will not be admissible.

Fed. R. Evid. 412 Advisory Committee notes.

The note further observes that:

> The balancing test requires the proponent of the evidence, whether plaintiff or defendant, to convince the court that the probative value of the proffered evidence "substantially outweighs the danger of harm to any victim and of unfair prejudice of any party."  This test for admitting evidence offered to prove sexual behavior or sexual propensity in civil cases differs in three respects from the general rule governing admissibility set forth in Rule 403.  First, it [r]everses that usual procedure spelled out in Rule 403 by shifting the burden to the proponent to demonstrate admissibility rather than making the opponent justify exclusion of the evidence.  Second, the standard expressed in subdivision (b)(2) is more stringent than in the original rule; it raises the threshold for admission by requiring that the probative value of the evidence *substantially* outweigh the specified dangers. Finally,  the Rule 412 test puts "harm to the victim" on the scale in addition to prejudice to the parties.

Id.

Finally, the Advisory Committee note makes the following statement about pre-trial issues:

> The procedures set forth in subdivision (c) do not apply to discovery of a victim's past sexual conduct or predisposition in civil cases, which will be continued to be governed by Fed. R. Civ. P. 26. In order not to undermine the rationale of Rule 412, however, courts should enter appropriate orders pursuant to Fed. R. Civ. P. 26 (c) to protect the victim against unwarranted inquiries and to ensure confidentiality. Courts should presumptively issue protective orders barring discovery unless the party seeking discovery makes a showing that the evidence sought to be discovered would be relevant under the facts and theories of the particular case, and cannot be obtained except through discovery. In an action for sexual harassment, for instance, while some evidence of the alleged victim's sexual behavior and/or predisposition in the workplace may perhaps be relevant, non-work place conduct will usually be irrelevant. *Cf. Burns v. McGregor Electronic Industries, Inc.*, 989 F.2d 959, 962-63 (8th Cir. 1993) (posing for a nude magazine outside work hours is irrelevant to issue of unwelcomeness of sexual advances at work). Confidentiality orders should be presumptively granted as well.

Id.

The Court should not consider the references to alleged activities Plaintiff engaged in outside the workplace, because they are not material to the question of whether she found Foerster's conduct offensive. "Whether a sexual advance was welcome, or whether an alleged victim in fact perceived an environment to be sexually offensive, does not turn on the private sexual behavior of the alleged victim, because a woman's expectations about her work environment cannot be said to change depending upon her sexual sophistication." Wolak v. Spucci, 217 F.3d 157, 160 (2d Cir. 2000) (refusing to consider evidence that the plaintiff viewed pornography at home to demonstrate that she did not find it offensive at the workplace). See also Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 963 (8th Cir. 1993) (plaintiff's decision to pose for a nude magazine outside of work not material to question whether she found work-

related conduct offensive); <u>Rodriguez-Hernandez v. Miranda-Velez</u>, 132 F.3d 848, 856 (1st Cir. 1998) (upholding the district court's ruling that evidence concerning plaintiff's moral character and the marital status of her boyfriend were inadmissible under Rule 412, while evidence concerning plaintiff's allegedly flirtatious behavior toward the accused harasser was admissible to determine welcomeness).

With respect to conduct in the workplace, Plaintiff admits that she is "not a prude" and that she engaged in joking banter and "talking trash" with her coworkers, but she states that she did not communicate with her superiors, Messrs. Foerster and Ryan, in the same manner. (Joseph Dep. at. 175-184 & Ex. 29.) Defendants have not disputed this point.[21]

She also notes that Arthur Heiles testified that the friendly banter in which she engaged was not interpreted by the other pilots as any kind of sexual invitation. (Heiles Dep. at 10-12.)[22] He also concurred with her statement that, while on duty, she always acted and dressed appropriately, wearing a conservative uniform. (Joseph Dep. at 178; Heiles Dep. at 17.) Even Foerster agreed with this assessment. (Foerster Dep. at 41.)

Plaintiff's conduct in the workplace, which consisted of playful banter of a sexual nature

---

[21]Interestingly, they cite <u>Sheffield v. Hilltop Sand & Gravel Co.</u>, 895 F. Supp. 105, 109 (E.D. Va. 1995). In that case, the plaintiff acknowledged that the alleged harasser's testimony about her provocative discussions **with him** was admissible because it related to the issue of welcomeness, but not the testimony of others. Defendants have not even suggested that Plaintiff had provocative discussions with Foerster.

[22]Defendants respond that her "friendly banter" with Voyager pilot John Wallace about oral sex led to Wallace sending her a picture of his penis on her cell phone, an act that did not offend her. (Joseph Dep. at 63, 93-94.) However, this is not an undisputed fact: the story in which Plaintiff and Wallace had a conversation which led to him sending the picture is taken from the deposition of Charles Falce and is not corroborated by Plaintiff. (Falce Dep. at 56-59.) When asked why she thought Wallace sent her the picture, Plaintiff responded "I have no clue." (Joseph Dep. at 98.)

with her colleagues (such as putting a pair of underwear in a coffee cup when a pilot asked for "something hot" to keep him awake or having a discussion about "blow jobs"), although it could be relevant if she were complaining about Foerster's language in the workplace, has no relevance under the circumstances presented in this case.  Such conduct on her part does not demonstrate that she welcomed sexual advances, physical touching or quid pro quo type propositions (no credit card, review or raise until she invited Foerster to her house) from anyone, especially a management level individual such as Foerster.  Foerster's alleged conduct is different qualitatively from the behavior Plaintiff engaged in, both because he held a management level position and because she has not accused him of shocking her with his language, but of grabbing her, kissing her, attempting to gain access to her hotel room without her permission and implying that her job and benefits were dependent upon her accession to his sexual demands.  Defendants cite no authority to support the proposition that consideration of this evidence would serve any purpose other than suggesting that Plaintiff was promiscuous and therefore anything Foerster might have done was welcomed on her part.[23]

Affirmative Defense

In <u>Faragher</u> and <u>Burlington Industries v. Ellerth</u>, 524 U.S. 742 (1998), the Supreme Court held that an employer will be held vicariously liable when a supervisor's harassment culminates

---

[23]Even a cursory review of the record reveals that Plaintiff is–or wishes to be seen as–a "colorful character."  At her deposition, when asked the reason she took out a loan, she jokingly answered "to buy condoms."  (Joseph Dep. at 42.)  She later explained that "I probably needed to pay rent...."  (Joseph Dep. at 189.)  Plaintiff's initial flippant response was not appropriate behavior for a deposition.  Nevertheless, Defendants manipulate the record when they suggest that this was the **true** reason Plaintiff took out the loan.  (Docket No. 46 ¶ 68(c).)  As this is Defendants' motion for summary judgment and as all evidence must be taken in the light most favorable to Plaintiff as the non-moving party, Defendants' tactic of citing only her initial answer and ignoring her later clarification is more egregious than her flippant response.

in a "tangible employment action" such as firing, demotion or undesirable reassignment, but that otherwise the employer can present a defense that it had a readily accessible and effective sexual harassment policy and that the plaintiff unreasonably failed to avail herself of it. The burden to establish this defense by a preponderance of the evidence falls on the employer. Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.

Defendants argue that they have established the elements of the affirmative defense in this case. They contend that: 1) Plaintiff received an employee handbook outlining Voyager's harassment policy; 2) she did not make any complaints until the morning of May 10, 2006, and the witnesses to the harassment she identifies do not corroborate her accusations; 3) when she made the complaint, Voyager president Ryan attempted to investigate, but before he could do so she unilaterally resigned; and 4) after an investigation, Voyager determined that the accusations were unfounded but nevertheless sent Foerster to a refresher course on sexual harassment but despite Voyager's offer to return, Plaintiff refused to do so.

Falce notes that Plaintiff never reported any inappropriate conduct by Foerster to him prior to their meeting on May 15, 2006, despite the written complaint procedures set forth in the employee handbook. (Falce Aff. ¶ 14.) Ryan states that she never reported any conduct to him until the morning of May 10, 2006. (Ryan Aff. ¶¶ 3, 13.)

Plaintiff contends initially that Defendants cannot avail themselves of the affirmative defense in this case because she did suffer tangible adverse employment actions: she was denied a corporate credit card, a performance review and a raise. Furthermore, she argues that: 1) she did complain prior to May 10, albeit to co-workers (pilots) rather than to management but these individuals had a duty to further report it and they did not; 2) her attempt to complain to Ryan

was met with resistance and veiled threats; 3) she did meet with Falce but was told that his

investigation proved her complaints were unfounded; and 4) she was not notified that Foerster

was being sent to a refresher course on sexual harassment (an event that actually occurred several

months later) and was not offered to return, only the opportunity to discuss the possibility.

The parties have not properly addressed the issues raised by this case.  Because Plaintiff

is alleging that she was subjected to a hostile work environment that culminated in her being

constructively discharged, the Court must analyze her claims under the appropriate case law for

that factual situation.

Constructive Discharge

The Supreme Court has recognized that:

> Under the constructive discharge doctrine, an employee's reasonable
> decision to resign because of unendurable working conditions is assimilated to a
> formal discharge for remedial purposes.  The inquiry is objective: Did working
> conditions become so intolerable that a reasonable person in the employee's
> position would have felt compelled to resign?

Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004) (citations omitted).  The Court

further observed that, as compared to a pure hostile work environment claim, "[a]

hostile-environment constructive discharge claim entails something more: A plaintiff who

advances such a compound claim must show working conditions so intolerable that a reasonable

person would have felt compelled to resign "  Id. at 147 (citations omitted).  In Suders, the

Supreme Court applied its holdings in Ellerth and Faragher to the constructive discharge

situation:

> To be sure, a constructive discharge is functionally the same as an actual
> termination in damages-enhancing respects.  As the Third Circuit observed, both
> "en[d] the employer-employee relationship," and both "inflic[t] ... direct economic
> harm." 325 F.3d, at 460 (internal quotation marks omitted).  But when an official

act does not underlie the constructive discharge, the <u>Ellerth</u> and <u>Faragher</u> analysis, we here hold, calls for extension of the affirmative defense to the employer. As those leading decisions indicate, official directions and declarations are the acts most likely to be brought home to the employer, the measures over which the employer can exercise greatest control.  See <u>Ellerth</u>, 524 U.S., at 762, 118 S.Ct. 2257.  Absent "an official act of the enterprise," <u>ibid.</u>, as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force.  And as <u>Ellerth</u> and <u>Faragher</u> further point out, an official act reflected in company records-a demotion or a reduction in compensation, for example-shows "beyond question" that the supervisor has used his managerial or controlling position to the employee's disadvantage.  See <u>Ellerth</u>, 524 U.S., at 760, 118 S.Ct. 2257.  Absent such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation, as we earlier recounted, is less certain.  That uncertainty, our precedent establishes, justifies affording the employer the chance to establish, through the <u>Ellerth/Faragher</u> affirmative defense, that it should not be held vicariously liable.

<u>Id.</u> at 148-49.  The Court cited two court of appeals decisions as appropriate examples of when the defense can be asserted and when it can not: <u>Reed v. MBNA Mktg. Sys., Ins.</u>, 333 F.3d 27 (1st Cir. 2003) (supervisor made sexual comments and assaulted plaintiff; employer could assert <u>Ellerth/Faragher</u> defense); <u>Robinson v. Sappington</u>, 351 F.3d 317 (7th Cir. 2003) (after plaintiff complained about sexual harassment by judge for whom she worked, presiding judge indicated that he would transfer her to another judge but told her that new post would be "hell" and that it was in her best interest to resign; employer could not assert affirmative defense).

Defendants argue that Plaintiff cannot maintain a constructive discharge claim because she cannot demonstrate that a reasonable person subjected to the alleged discrimination would have been compelled to resign, and she cannot establish the predicate existence of a legally cognizable hostile work environment.  As the discussion above indicates, Plaintiff has satisfied her burden of demonstrating a prima facie case of a legally cognizable hostile work environment.

With respect to the issue of the affirmative defense, this case presents a difficult situation.

33

On the one hand, Ryan's alleged disparaging comments that Plaintiff was a troublemaker and that she was ruining the career of someone liked by the company owners could be seen as the "final straw" which led to Plaintiff's decision to resign, like the presiding judge's comments to the plaintiff in the Robinson case. If true, the final straw would constitute an "official act" and Voyager would not be entitled to assert the affirmative defense.

However, Voyager denies that Ryan made this phone call, thus presenting a genuine issue of material fact on this important and disputed issue. The parties have not cited and this Court has not found a case in which the facts surrounding the "final straw" in a hostile environment constructive discharge case were themselves disputed. Therefore, the facts should be presented to the jury, which will determine first whether Ryan called Plaintiff and told her she was a troublemaker and therefore was subjected to an official act (as well as whether she was subjected to severe or pervasive harassment and whether she acted reasonably when she resigned). If the jury finds in Plaintiff's favor on this issue, then it should not be asked to address the facts relating to the Ellerth/Faragher defense. Conversely, if the jury concludes that the phone call did not occur, then it should be asked to address whether Voyager had an effective anti-harassment policy and whether Plaintiff unreasonably failed to avail herself of it.

The factual dispute about the phone call also affects the question of whether Plaintiff acted reasonably when she resigned. If, as she claims, her attempt to contact the president of the company was met with hostility and resistance, then she has presented a situation in which a reasonable person might have felt compelled to resign. See Suders v. Easton, 325 F.3d 432, 445 (3d Cir. 2003) (one factor to consider is whether employee explored alternative avenues prior to resigning). In addition, she has stated that Foerster constantly told her he had a stack of resumes

of women who were "dying to replace" her, making it clear to her that she "walked a tightrope." Although Defendants have denied that Foerster ever said this, viewing the evidence in the light most favorable to Plaintiff as the non-moving party, she has presented evidence that her job was being threatened, which is one of the situations identified by the Court of Appeals as possibly indicative of a constructive discharge. Id. (citing Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

However, if the facts are as Voyager presents them, then her email message telling Ryan she was resigning, sent a few hours after he indicated that he wanted to meet with her to discuss her complaints and before the company could even attempt to investigate them, was not a reasonable response. Because the facts concerning this important issue are disputed, the Court cannot determine as a matter of law that Plaintiff has failed to present facts establishing a hostile work environment culminating in a constructive discharge.

In addition, even if the Court were to reach the issue of the affirmative defense, Defendants have not demonstrated that Plaintiff unreasonably failed to avail herself of Voyager's sexual harassment policy or that it was effective. Defendants' argument is predicated on facts that are disputed and which must be viewed in the light most favorable to Plaintiff as the non-moving party. Ryan, Falce, and Hargrave may have testified that Plaintiff did not report incidents of harassment to them, but she testified that she did make complaints of Foerster's conduct to Hargrave, Verner and Heiles. Heiles confirms that she did report the hotel room incident to him and Verner states only that he did not witness any harassment,[24] not that Plaintiff

---

[24]Defendants also cite Falce's deposition testimony that Verner "has only heard things from Ms. Joseph since he does not fly with Mr. Foerster" (Falce Dep. Ex. 5 at 6) and that he "had
(continued...)

did not report it to him.  Hargrave's testimony that Plaintiff did not report incidents of

harassment to him directly contradicts her testimony that she did and this disputed fact must be

resolved by the jury.  And the fact that Plaintiff accuses Foerster of conduct that he denies creates

a classic genuine issue of material fact requiring the submission of the issue (and the credibility

of the witnesses) to the jury.

Defendants contend that Plaintiff said yes at her deposition when asked if the May 10,

2006 phone call to Ryan was "the first time that [she] had made any allegations of sexually

inappropriate conduct to Voyager...  Isn't that true?"  (Joseph Dep. at 121.)  Plaintiff responds

that the context of this testimony makes clear that she meant that she had previously complained

about Foerster's conduct to Voyager pilots, although not management personnel such as Ryan,

until May 10.  They also note that she stated at one point "I didn't report anything to anybody."

(Joseph Dep. at 125.)  Plaintiff responds that the context makes clear that this statement referred

only to the two instances when Foerster kissed her.

Whether or not certain portions of Plaintiff's testimony can be reconciled with other

portions of her testimony is not a matter for this Court to resolve on summary judgment.  For

purposes of this motion, the Court will presume that the jury heard only that portion of her

deposition in which she stated that she reported Foerster's conduct to Heiles, Verner and

Hargrave.  Viewing the record in this manner, Defendants have not demonstrated that they are

---

[24](...continued)
no firsthand knowledge of anything." (Falce Dep. at 38.)  Again, the fact that Verner did not have
firsthand knowledge of Plaintiff's allegations is irrelevant to the issue of whether she reported
them to him.  Defendants provide no support for the notion that Falce's belief that Plaintiff's
allegations were to be rejected unless other witnesses corroborated them is an appropriate
approach under the law.

entitled to summary judgment.  The trier of fact can hear her testimony (as well as that of other witnesses) and make credibility determinations thereon.

A case similar to this one is Clark v. United Parcel Service, Inc., 400 F.3d 341 (6th Cir. 2005).  In that case, two women brought suit, alleging a hostile work environment at UPS created by a supervisor named Brock.  They alleged that Brock told sexual jokes, placed his vibrating pager on them and asked if it "felt good," made suggestive comments and leered at them in the workplace, often in the presence of supervisors (UPS denied all of their allegations).  UPS contended that it was entitled to the affirmative defense because it promulgated a sexual harassment policy and the women did not avail themselves of it until an investigator spoke to them about another matter and they revealed Brock's actions, at which point Brock was sent home and subsequently allowed to resign under threat of discharge.  The court noted that employers have an affirmative duty to prevent sexual harassment by supervisors and that the duty does not end with the promulgation of a policy: "Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior."  Id. at 349 (citations omitted).  The court stated that:

> While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment, see Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996); (2) permit both informal and formal complaints of harassment to be made, Wilson v. Tulsa Junior Coll., 164 F.3d 534, 541 (10th Cir. 1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, Faragher, 524 U.S. at 808, 118 S.Ct. 2275; and (4) and provide for training regarding the policy, Wilson, 164 F.3d at 541.  As previously set forth, UPS's policy facially meets all of these requirements, and therefore on paper, as even the EEOC concedes in its amicus brief, UPS has a reasonable sexual harassment policy.

Id. at 349-50.  However, because UPS's policy required supervisors who witnessed harassment to report it, "there is a real question as to whether the supervisors should have taken the first step towards prevention and correction by reporting these incidents to the relevant UPS personnel, as was directed by the UPS policy.  Thus, whether UPS, via these employees, exercised reasonable care is a question for the factfinder."  Id. at 350-51 (citations omitted).  See also Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004) (company not entitled to affirmative defense based on existence of complaint hotline when–according to the plaintiff's version of events–her attempt to use it was rebuffed); Suders, 325 F.3d at 443 (plaintiff attempted to contact EEO officer on two occasions, but EEO officer never followed up, never provided form she said plaintiff needed to file and conveyed insensitive and unhelpful attitude; court found genuine issues of material fact as to whether employer exercised reasonable care to prevent or correct sexual harassment).

In this case, Voyager's own policy directs everyone in the workplace to protect the rights of employees to be free from harassment, indicates that anyone who witnesses harassment of others should report it to his or her immediate supervisor, a higher company official or the Human Resources department and directs supervisors to report incidents immediately to the Human Resources department.  Plaintiff argues that Heiles, Verner and Hargrave had a duty to report Foerster's conduct, even if they did not personally witness it.  Defendant has not responded to this argument.  Although the policy may not reach as far as Plaintiff contends, it would clearly impose on Hargrave (the Chief Pilot) the duty to report any harassment he witnessed and, according to Plaintiff's version of events, he witnessed Foerster tell her that he could not wait to get her to Mexico and responded by telling her he would not let Foerster near her during the trip.  Hargrave denies that these events occurred and the jury will have to hear the

witnesses and resolve this disputed issue of material fact.

Furthermore, the record contains differing testimony as to what happened when Plaintiff called Ryan on May 10 and during Falce's subsequent investigation, what was reported back to Plaintiff and what steps Voyager took to ensure that Plaintiff would not be subjected to harassment in the workplace. Weighing the credibility of these witnesses is a function of the trier of fact. Accepting all disputed facts and drawing all reasonable inferences in favor of Plaintiff, the non-moving party, she has presented evidence that she tried to avail herself of Voyager's sexual harassment policy, but obtained no relief because the president of the company told her she was a troublemaker, the Senior Vice President of Human Resources dismissed her claims because she could not corroborate them and is now misrepresenting that he told her he sent Foerster for refresher training and that he asked her to rescind her resignation.

Voyager provides no support for its contentions that a victim of sexual harassment is required to corroborate her accusations with eyewitness testimony and that an investigation in which the victim is merely informed that she was not believed because her accusations could not be corroborated is an adequate remedial response under Title VII. On the contrary, under these circumstances, courts generally find employer responses to be adequate when the harasser is warned not to engage in the behavior, reprimanded, separated from the victim and so on. See, e.g. Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1049 (7th Cir. 2000) (completion of investigation within two weeks resulting in letter of reprimand, sensitivity training and apology to victim was appropriate remedial action); Savino v. C.P. Hall Co., 199 F.3d 925, 930 (7th Cir. 1999) (where no corroboration of events, reprimand of harasser and warning not to harass or retaliate were sufficient).

Voyager's investigation does not resemble these examples of adequate remedial actions. Rather, Falce seemed to believe that Plaintiff had to corroborate her accusations or they would be deemed unsupported and Voyager now argues that this approach was appropriate. No effort was made to separate Foerster from her and she was given no reason to believe the harassment would not continue if she returned to her position. Moreover, as noted above, Falce has testified that Foerster was sent to refresher training and that Plaintiff was informed of this fact. But the record reflects that Plaintiff was not informed of this fact and, more importantly, that Foerster was not sent to refresher training until months later. Weighing all disputed evidence in Plaintiff's favor and drawing all inferences in her favor as the non-moving party, Defendants have not demonstrated that they would be entitled to avoid liability based on the affirmative defense, even assuming that it can be utilized in this case. Therefore, with respect to Counts I and II, Defendants' motion for summary judgment should be denied.

Limitation of Damages

Defendants argue that Voyager is entitled to partial summary judgment on the issue of damages in that Plaintiff is not entitled to any back or front pay damages in light of her unreasonable refusal to return to work. They contend that her rejection of an unconditional offer of reinstatement terminates her right to any back pay (even if Voyager is found to have violated the law) and that she cannot obtain reinstatement or front pay for this same reason.

These issues are not ripe for adjudication at this stage of the proceedings. Rather, they can be presented at trial or thereafter if Plaintiff is successful on the merits of her claims. Therefore, Defendants' motion for partial summary judgment on the issues of front pay and back pay should be denied.

<u>Count III: Assault and Battery Claims Against Foerster</u>

Defendants argue that Foerster is entitled to summary judgment with respect to her state law claims of assault and battery. Plaintiff responds that she has put forth sufficient evidence to submit both claims to the jury.

Judge Cohill recently summarized Pennsylvania law on these claims as follows:

> In order to establish a prima facie case for assault, a plaintiff must allege that the defendant acted "intending to cause imminent apprehension of a harmful or offensive bodily contact." <u>Restatement (Second) of Torts</u> § 21 (4th ed. 1989). To state a claim for battery, a plaintiff must allege that the defendant acted "intending to cause a harmful or offensive contact or an imminent apprehension of such contact and [an] offensive contact result[ed]." <u>Restatements (Second) of Torts</u> § 18 (4th ed. 1989); <u>see also</u> <u>Herr v. Booten</u>, 398 Pa. Super. 166, 580 A.2d 1115, 1117 (Pa. Super. 1990) (dismissing plaintiff's claim for battery when no harmful or offensive contact occurred).

<u>Bryan v. Erie County Office of Children & Youth</u>, 2006 WL 2850446, at *27 (W.D. Pa. Sep. 29, 2006).

In this case, physical contact occurred when Foerster kissed her on two occasions and "grabbed her in and out" on the plane, Plaintiff has testified that she found it offensive and that Foerster acted to cause this offensive contact. Under these circumstances, Defendants have not demonstrated that summary judgment for Foerster is appropriate. Therefore, with respect to Count III, Defendants' motion for summary judgment should be denied.

<u>Motions to Strike</u>

Defendants move to strike two exhibits from Plaintiff's appendix–various newspaper articles that portray her in a positive light (Pl.'s App. Ex. 9) and various other materials that she characterizes as "community recognition" (Pl.'s App. Ex. 10)–on the grounds that they are

unauthenticated and that no foundation has been provided for them.[25]  Plaintiff moves to strike

paragraphs 5, 31, 54 and Exhibit A from Defendants' Reply to Plaintiff's Counterstatement of

Material Facts (Docket No. 50) on the grounds that they are not supported by record evidence,

are contradicted by other evidence in the record or are non-responsive.

For the reasons explained above, this Report and Recommendation does not rely on the

evidence cited in these motions.  Therefore, the motions to strike should be dismissed as moot.

For these reasons, it is recommended that the motion for summary judgment submitted on

behalf of Defendants Voyager Jet Center, LLC and Karl Foerster (Docket No. 44) be denied.  It is

further recommended that the motion to strike filed by Defendants (Docket No. 52) be dismissed

as moot.  It is further recommended that the motion to strike filed by Plaintiff (Docket No. 55) be

dismissed as moot.

Within thirteen (13) days of being served with a copy, any party may serve and file

written objections to this Report and Recommendation.  Any party opposing the objections shall

have seven (7) days from the date of service of objections to respond thereto.  Failure to file

timely objections may constitute a waiver of any appellate rights.


Respectfully submitted,


s/Robert C.  Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: April 24, 2008

_____

[25]Defendants also moved to strike Plaintiff's EEOC questionnaire.  However, in their
reply to Plaintiff's response, they concede that it is admissible.  (Docket No. 54 ¶ 6.)